IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **MELISSA BORRETT, individually and on behalf of all others similarly situated,** | **Case No.** |
| **Plaintiff,** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **AHS MANAGEMENT COMPANY, INC., D/B/A ARDENT HEALTH SERVICES** | **CLASS ACTION** |
| **Defendant.** | |

## CLASS ACTION COMPLAINT

Plaintiff Melissa Borrett ("Plaintiff or "Ms. Borrett") brings this class action lawsuit in her individual capacity and on behalf of all others similarly situated against AHS Management Company, Inc., d/b/a Ardent Health Services ("Ardent" or "Defendant") and alleges, upon personal knowledge as to her own actions, her counsel's investigation and upon information and good faith belief as to all other matters, as follows:

## NATURE OF THE ACTION

1. Information about a person's physical and mental health is among the most confidential and sensitive information in our society. The mishandling of such information can have serious consequences, including, but certainly not limited to, discrimination in the workplace and/or denial of insurance coverage.[1]

---

[1] *See* Lindsey Ellefson, *Telehealth Sites Put Addiction Patient Data at Risk: New research found pervasive use of tracking tech on substance-abuse-focused health care websites, potentially endangering users in a post-Roe world*, WIRED (Nov. 16, 2022) https://www.wired.com/story/substance-abuse-telehealth-privacy-tracking-tech/ ("While the sharing of any kind of patient information is often strictly regulated or outright forbidden, it's even more verboten in addiction treatment, as patients' medical history can be inherently criminal and stigmatized."); *see also* Tood Feathers, Simon Fondrie-Teitler, Angie Waller & Surya Mattu, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, THE MARKUP

2. Simply put, if people do not trust that their sensitive, private information will be kept private, they are less likely to seek medical treatment, which can lead to much more serious health consequences down the road. In addition, protecting medical information and ensuring it is kept confidential and not disclosed to anyone other than the person's medical providers is vitally necessary to maintain public trust in the healthcare system as a whole.

3. Protected and highly sensitive medical information collected by healthcare entities includes many categories, from intimate details of an individual's treatment to any unique identifying code that can connect the individual to the collecting entity.

4. As detailed below, Defendant's illegal and widespread practice of disclosing Plaintiff's and putative class members' confidential personally identifiable information ("PII") and protected health information ("PHI" and, collectively with PII, "Private Information") to third parties, including but not necessarily limited to Google, LLC ("Google") and AdTheorent Health ("AdTheorent"), is an ongoing harm to their users and the healthcare system as a whole.

**Defendant Collects Vast Troves of Private Information**

5. Ardent provides centralized management and administrative services to a network of Ardent-affiliated hospitals and healthcare locations, which includes 30 hospitals and approximately 285 sites of care across six States. Ardent owns, controls, and operates at least nine principal, regionally branded websites for each network, including *https://lovelace.com* *https://hillcrest.com*, *https://bsahs.org*, *https://mountainsidemedicalcenter.com*, *https://pascackmedicalcenter.com*, *https://portneuf.org*, *https://kutopeka.com*, *https://uthealtheasttexas.com*, and *setonharkerheights.net* (collectively, the "Websites" or "Ardent Websites").

(June 16, 2022), https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.

6. Ardent, through the hospital affiliates it manages, encourages patients to use the Websites for booking medical appointments, locating physicians and treatment facilities, communicating medical symptoms, searching medical conditions and treatment options, signing up for events and more.

7. Plaintiff and members of the putative class ("Class Members" and with Plaintiff, "Users" and each a "User") who visited and used Defendant's Websites understandably thought they were communicating *only* with their trusted healthcare providers.

8. Unbeknownst to the Users, however, Defendant embedded various third-parties' tracking technologies on the Websites, including but not limited to, Google DoubleClick, Google Analytics, and the AdTheorent Pixel (collectively, "Tracking Tools"). The Tracking Tools automatically transmit to third parties every click, keystroke and detail about Users' medical treatment.

9. Operating as designed and as implemented by Defendant, the Tracking Tools cause the Private Information that Users provide to Defendant to be unlawfully disclosed to third parties, like Google.

10. The Private Information that Defendant sends to third parties is also linked to Users' unique IP addresses or other identifiable user profiles created by the Tracking Tools, which allow the Users to be personally identifiable to the third parties.

11. The Tracking Tools are snippets of code embedded on a website (or other digital platform) that surveil and record a User's identity and activity, such as how long a person spends on a particular web page, which buttons the person clicks, which pages they view and the text or phrases they type into various portions of the website (such as a general search bar, chat feature or text box), among other things.

12. The Users' web browsers execute the Tracking Tool via instructions within the webpage to communicate certain information based on parameters selected by the Websites' owner. The Tracking Tools are customizable and programmable, meaning that the Websites' owner controls which of its web pages contain the Tracking Tools and which events are tracked and transmitted to third parties.

13. By installing the Tracking Tools, Defendant effectively planted a bug on the Users' web browsers and compelled them to unknowingly disclose their private, sensitive, and confidential health-related communications with Defendant to third parties.

14. Defendant utilized the Tracking Tools for marketing purposes to bolster its profits; that is, despite its duty to maintain the privacy of its Users' Private Information, Defendant prioritized its own desire for profit over the privacy rights of patients.

15. The Tracking Tools are routinely used to target specific customers by utilizing data to build incredibly fulsome and robust profiles for the purposes of retargeting and future marketing. Third parties use the Users' Private Information to create targeted advertisements based on the medical conditions and other Private Information disclosed to Defendant.

16. The information that Defendant's Tracking Tools sent to third parties included the Private Information that Users submitted to the Websites, including for example: patient status; medical conditions searched by Users; names of providers whose profile pages were viewed by the Users; when Users click to sign in to the MyChart patient portal; when Users click to pay a bill; facility locations selected or searched by Users; Users' free-text searches made via the search bar; when Users click to call their providers; Users' appointment scheduling; and every page URL Users visited on the Websites. This information was transmitted by Defendant to third parties alongside Users' personal identifiers, including IP addresses and unique cookie identifiers

associated with Google and other third-party tracking technologies.

17. The information described in the preceding paragraph allows a third party (*e.g.*, Google) to learn and record that a specific patient sought confidential medical care. Third parties, in turn, sell Users' Private Information to fourth-party marketers who geo-target Users based on communications obtained via the Tracking Tools.

18. Google and third-party purchasers of Users' Private Information also could reasonably infer from the data sent by Defendant's Tracking Tools that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia or HIV.

**Defendant's Disclosure of Users' Private Information Without Consent Violates the Law**

19. Healthcare patients simply do not anticipate that their personal health information or confidential medical information will be sent to undisclosed third parties without the patients' informed and express consent.

20. Neither Plaintiff nor any other Class Member was provided, much less signed, a written authorization permitting Defendant to disclose their Private Information to third parties.

21. Despite willfully and intentionally incorporating the Tracking Tools into its Websites and servers, Defendant never disclosed to Users that it shared their sensitive and confidential communications and Private Information with third parties.[2]

---

[2] In contrast to Defendant, several medical providers have notified their patients of the fact that similar tracking technologies disclosed Private Information to third parties. *See*, *e.g.*, *Cerebral, Inc. Notice of HIPAA Privacy Breach*, https://cerebral.com/static/hippa_privacy_breach-4000c6eb21449c2ecd8bd13706750cc2.pdf; *Advocate Aurora says 3M patients' health data possibly exposed through tracking technologies* (Oct. 20, 2022) https://www.fiercehealthcare.com/health-tech/advocate-aurora-health-data-breach-revealed-pixels-protected-health-information-3; *Novant Health 1.36 Million Patients About Unauthorized Disclosure of PHI via Meta Pixel Code on Patient Portal* (Aug. 16, 2022), https://www.hipaajournal.com/novant-health-notifies-patients-about-unauthorized-disclosure-of-phi-via-meta-pixel-code-on-patient-portal/.

22. Defendant's overall intent and purpose for installing the Tracking Tools on its Websites was to intercept and disclose its Users' Private Information to third-party marketing vendors to increase its ability to market and retarget the Websites' Users, thereby increasing its profit while violating federal statutes and other laws.

23. Users were unaware that their Private Information was being surreptitiously transmitted to third parties as they communicated with their healthcare providers via Defendant's Websites or that their information was stored on Defendant's servers to be later transmitted to third parties so it could be used for targeted advertising and marketing purposes.

24. As detailed below, Defendant owed statutory, regulatory, and contractual duties to keep Users' communications and medical information safe, secure and confidential.

25. The disclosure of Users' Private Information via the Tracking Tools contravenes the letter and spirit of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"). Under HIPAA, the United States Department of Health and Human Services ("HHS") established its Standards for Privacy of Individually Identifiable Health Information (the "Privacy Rule"), which governs how health care providers must safeguard and protect Private Information.

26. Under the Privacy Rule, covered entities such as Defendant are ***not*** permitted to use tracking technology tools in a way that exposes patients' Private Information to any third party without express and informed consent from each patient.

27. Lest there be any doubt of the illegal nature of Defendant's practice, the Office for Civil Rights ("OCR") at HHS has made clear, in a recent bulletin entitled Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates (the "Bulletin"), that the unlawful transmission of such protected information violates the Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to

tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[3]

28. The HHS Bulletin does not change any existing rule or impose any new obligation on HIPAA-covered entities. Instead, it reminds these entities of their long-standing obligations by referring to guidance and rules that have been in place for decades. *Id.* (stating that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors").

29. In contrast to Defendant, several medical providers that used the Tracking Tools in a similar way have provided their patients with notice that their Private Information was transmitted to third parties.[4]

30. Defendant, moreover, made express promises to protect its Users' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant. Furthermore, by obtaining, collecting, using and deriving a benefit from Users' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

31. Defendant breached its statutory, regulatory and contractual obligations to its Users by, *inter alia*: (i) failing to adequately review its marketing programs and web based technologies to ensure the Websites were safe and secure; (ii) failing to remove or disengage technology that was known and designed to share Users' Private Information; (iii) failing to obtain the written consent of its Users to disclose their Private Information to Google and other third parties;

---

[3] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, available at https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited May 12, 2026) (emphasis added).
[4] *See supra* note 2.

(iv) failing to take steps to block the transmission of its Users' Private Information through the Tracking Tools; (v) failing to warn its Users of sharing their Private Information with third parties and (vi) otherwise failing to design and monitor the Websites to maintain the confidentiality, security and integrity of Users' Private Information.

32. As a result, Users suffered injury and are entitled to relief, including statutory damages, any profits made by Defendant as a result of the violations, restitution and disgorgement of the benefits Defendant unjustly obtained, and injunctive relief to prevent continued unauthorized disclosures of their Private Information.

33. Plaintiff therefore seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and assert statutory claims against Defendant for: (i) violations of the Electronic Communications Privacy Act of 1986 ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*, and (ii) unjust enrichment under Tennessee common law.

## PARTIES

34. Plaintiff is a natural person and a citizen of the State of New Mexico. Ms. Borrett has been a patient of Lovelace Health System since at least July 2024 and has maintained a Google account since at least 2020. During the relevant time period, Ms. Borrett has used one of Defendant's Websites, *https://lovelace.com*, to request information on specific medical services; to call/contact research providers and locations and to login to the MyChart patient portal. By doing so, Ms. Borrett's individually identifiable health information was disclosed to third parties under the systematic process described above. Ms. Borrett had no knowledge her sensitive medical information was shared with Google or other third parties and gave no consent or authorization for Defendant to use her individually identifiable health information.

35. AHS Management Company, Inc. d/b/a Ardent Health Services is a Tennessee

corporation with its principal place of business located at 340 Seven Springs Way, Suite 100, Brentwood, Tennessee 37027.

36. Defendant is a healthcare management company that provides centralized management and administrative services to hospitals and healthcare delivery locations affiliated with its parent company Ardent Health, Inc., including Lovelace Health System, Hillcrest HealthCare System, BSA Health System, Portneuf Medical Center, The University of Kansas Health System St. Francis Campus, UT Health East Texas, and Seton Medical Center Harker Heights. As alleged herein, Defendant centrally owns, controls, maintains, and operates the Websites through which those affiliated providers interact with patients and installed and utilized materially identical Tracking Tools on all of them.

37. In providing these management and administrative services, Defendant creates, receives, maintains, or transmits PHI on behalf of the affiliated healthcare providers, each of which is a covered entity under HIPAA. Defendant therefore qualifies as a "business associate" and is thus directly subject to HIPAA's applicable requirements governing the use and disclosure of protected health information. 45 C.F.R. §§ 160.102(b), 160.103, 164.502(a)(3).

## JURISDICTION AND VENUE

38. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the claims that arise under federal law, specifically the ECPA, 18 U.S.C. § 2510, *et seq*. This Court also has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367(a), because all claims alleged form part of the same case or controversy.

39. This Court also has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), which expressly provides federal courts with jurisdiction over any class action in which: the proposed class includes at least 100 members; any

member of the class is a citizen of a State and any defendant is a citizen or subject of a foreign State; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs.

40. This Court has personal jurisdiction over Defendant, because it operates and maintains its principal place of business in this District. Further, Defendant is authorized to and regularly conducts business in this District and makes decisions regarding corporate governance and management of the Websites in this District, including decisions regarding the privacy of Users' Private Information and the incorporation of the Tracking Tools.

41. Venue is proper in this District under 28 U.S.C. § 1391, because Defendant does business in and is subject to personal jurisdiction in this District. Venue is also proper in this District because a substantial part of the events or omissions giving rise to the claim occurred in and emanated from this District.

## COMMON FACTUAL ALLEGATIONS

### A. Background: The Use of Tracking Technologies in the Healthcare Industry.

42. Tracking tools installed on many hospitals', telehealth companies' and other healthcare providers' and covered entities' websites (and other digital properties) are collecting patients' and other visitors' confidential and private health information—including details about their medical conditions, prescriptions and appointments, among many other things—and sending that information to third-party vendors without prior, informed consent.

43. These tracking tools are snippets of code that track users as they navigate through a website, logging which pages they visit, which buttons they click, and additional information they enter into forms. In exchange for installing tracking tools, the third-party platforms (*e.g.,* Facebook and Google) provide website owners with analytics about the advertisements they have placed as well as tools to target people who have visited their websites.

44. While the information captured and disclosed without permission may vary

depending on the tracking tools embedded, these "data packets" can be extensive, sending for example not just the name of the physician and her field of medicine but also the first name, last name, email address, phone number, zip code and city of residence entered into a booking form.

45. The data set forth in the preceding paragraph is linked to a specific internet protocol ("IP") address and several forms of unique identifier cookies. These cookies enable third-party vendors like Google to create a comprehensive user profile by connecting web activity to an existing account or, even if the user is not signed into such accounts, to another unique user profile.

46. IP addresses and cookie identifiers are considered PHI when connected to treatment records or other protected information under HIPAA.[5]

47. Investigative journalists have published several reports detailing the seemingly ubiquitous use of tracking technologies on hospitals', health care providers' and telehealth companies' digital properties to surreptitiously capture and to disclose their users' personal health information.

48. Specifically, and for example, *The Markup* reported that 33 of the largest 100 hospital systems in the country utilized Meta Pixel to send Meta a packet of data whenever a person clicked a button to schedule a doctor's appointment.[6]

**B. Defendant Installed and Utilized Materially Identical Tracking Technology on the Websites for the Purpose of Disclosing Plaintiff's and Class Members' Private Information to Third Parties.**

49. Defendant purposely installed materially identical Tracking Tools, including but not limited to Google Analytics, Google DoubleClick and the Adtheorent Pixel, on its Websites and programmed the Websites to surreptitiously share its patients' private electronic

[5] *See Use of Online Tracking Technologies by HIPAA*, *supra* note 3.
[6] *See supra* note 1.

communications and Private Information with the same third parties.

50. On numerous occasions, with the most recent in May 2025, Plaintiff accessed one of Defendant's Websites, *https://lovelace.com*, on her phone and used the Website to call her medical providers, request information on specific medical services, research providers, and login to MyChart.

51. Defendant used its Tracking Tools to intercept and disclose Ms. Borrett's communications, including those containing Private Information, to its third-party marketing vendors.

52. Defendant caused these interceptions without Plaintiff's knowledge, consent or express written authorization. By failing to receive the requisite consent, Defendant breached its duty of confidentiality and unlawfully disclosed Plaintiff's Private Information.

53. Users' private information would not have been disclosed to Google, Adtheorent, or other third parties through the Tracking Tools but for Defendant's decision to install, configure, and implement those tools on the Websites.

**C. Defendant Installed Google's Tracking Tools, Including Google DoubleClick and Google Analytics, on the Websites and Used Them to Intercept, Duplicate, and Disclose Plaintiff's and Class Members' Private Information to Third Parties.**

54. By many measures, Google is one of the world's largest data and advertising companies. Among other services, Google operates Google Search, Gmail, YouTube, Google Maps, Google Analytics, Google Ads, and Google DoubleClick.

55. Google Analytics is an analytics service that allows website operators to measure website traffic, user behavior, and engagement across websites and digital platforms. Google DoubleClick is an advertising technology that tracks users across the internet using cookies, identifiers, and user communications to measure advertising performance, build audiences, and

deliver targeted advertisements.

56. Defendant installed and utilized Google Analytics and Google DoubleClick (together, the "Google Tracking Tools"), on its Websites. By doing so, Defendant caused its Users' browsers to communicate with Google while they were communicating with Defendant through the Websites.

57. Google's advertising technologies do not operate anonymously. Google expressly confirms that cookies may be used in conjunction with other advertising technologies and that server logs include identifiers that distinguish and, when a user is signed in, may uniquely identify a user. Google states that, in the context of advertising, "we store a record of the ads we serve in our logs," and that those logs "typically include your web request, IP address, browser type, browser language, the date and time of your request, and one or more cookies that may uniquely identify your browser or, if you are signed-in, that may uniquely identify you."[7]

58. Google's tracking ecosystem uses cookies that are personally identifying to Google. Google explains that "cookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google Account ID and most recent sign-in time."[8]

59. Google also uses advertising cookies to target and deliver ads, including across non-Google sites. Google states: "The 'IDE' cookie is used to show Google ads on non-Google sites," and that the "'NID' cookie can be used to show ads in Google services for signed-out users." In addition, Google explains that "the 'DSID' cookie is used to identify a signed-in user on non-Google sites," confirming that Google can recognize a logged-in user even while that user

---

[7] Google, Advertising & Measurement Technologies, https://policies.google.com/technologies/ads (last visited July 21, 2026).
[8] Google, How Google Uses Cookies & Similar Technologies, https://policies.google.com/technologies/cookies?hl=en-US (last visited July 21, 2026).

browses a third-party website.[9]

60. Further, independent cookie registers identify Google's __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC cookies as Google cookies used for targeting purposes, including building a profile of a website visitor's interests to deliver relevant or personalized Google advertising through retargeting.[10]

61. The cookies and identifiers used by Defendant's Websites that enable the Google Tracking Tools to acquire and record user communications and user-identifying information include, among others, the cookies named IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC. Each cookie functions as a persistent personal identifier when received by Google and is used by Google's advertising and analytics systems to associate user activity with Google's existing user and device profiles.

62. Defendant installed the Google Tracking Tools, as well as other tracking technologies, on many, if not all, of the webpages within the Websites and programmed or permitted those webpages to surreptitiously share Users' Private Information and User-identifying information with Google.

63. While Users navigated Defendant's Websites, the Websites provided Google with their IP addresses, device identifiers, browser information, cookie identifiers, page URLs, referral information, and information reflecting their interactions with the Websites, including the pages they viewed, buttons and links they clicked, forms they accessed, information they entered or submitted, and the date and time of those communications. This is precisely the type of identifying

---

[9] *Id.*

[10] People's Partnership, Cookie Policy, https://peoplespartnership.co.uk/cookie-policy/ (last visited July 21, 2026).

information that HIPAA requires covered entities to anonymize to protect the privacy of patients.[11]

64. Users' communications and User-identifying information would not have been disclosed to Google via the Google Tracking Tools but for Defendant's decision to install and implement those tools on the Websites.

**D. AdTheorent Tracking Tools, Including the AdTheorent Health Pixel.**

65. AdTheorent is owned by Cadent, LLC, a New York–based advertising technology company that operates a demand-side platform ("DSP") used by healthcare marketers to plan, purchase, and optimize programmatic advertising campaigns. Cadent also offers audience activation and targeting capabilities designed to reach relevant audiences across multiple digital channels.[12]

66. One activation and targeting tool Cadent offers to marketers is the AdTheorent Health Pixel, a JavaScript tracking tag placed on advertisers' websites. According to Cadent's product materials for AdTheorent Health Pixel, it collects information about on-site behavior such as page views, referrers, user actions, conversions, and custom events. This information is used to build audiences, measure performance, and attribute advertising results to specific users.[13]

67. When the AdTheorent Pixel loads, it communicates with https://adentifi.com/, which sets a persistent tracking identifier known as the adtheorent[cuid]. The visitor's

---

[11] *See* U.S. Dep't of Health & Hum. Servs., *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited July 21, 2026).

[12] *See* Cadent, *AdTheorent Predictive Audiences Resource Library*, https://info.cadent.com/adtheorent-predictive-audiences (last visited July 21, 2026).

[13] Cadent, *AdTheorent Overview* (2023), https://info.cadent.com/hubfs/AdTheorent%20Overview.pdf?hsLang=en (last visited July 21, 2026); Cadent, *AdTheorent Health Prescription Lift Success Story*, https://info.cadent.com/hubfs/AdTheorent%20Health%20Prescription%20Lift%20Success%20Story.pdf?hsLang=en (last visited July 21, 2026).

adtheorent[cuid] is used to record details about a visitor's activity, such as the pages they viewed and the locations they accessed.

68. Defendant installed and utilized AdTheorent tracking tools, including the AdTheorent Health Pixel. on its Websites and programmed those technologies to operate in a manner that caused Users' communications, activities, and identities to be transmitted to Cadent, LLC and other third parties in connection with AdTheorent advertising and analytics services.

**E. Defendant's Centralized Installation, Operation and Control of Tracking on the Websites.**

69. Although Ardent-affiliated hospitals operate under separate regional brands, Defendant centrally designs, administers, operates and controls the digital infrastructure deployed across the Ardent Websites. The uniform code and shared architecture described below reflect a single, uniform and standardized enterprise-wide implementation by Defendant, rather than independent tracking decisions by each hospital or hospital system.

70. Defendant's own public statements confirm its enterprise-wide administration of the affiliated healthcare providers' digital platforms. In June 2023, Defendant announced a five-year enterprise partnership with Loyal, which describes itself as "the leading end-to-end digital healthcare platform that unifies care touchpoints for patients and providers alike."[14] Through the partnership, Defendant agreed to deploy Loyal's suite of consumer-engagement solutions across the Ardent network. As Defendant stated, once fully operationalized, Loyal's platform would "touch every part of the patient journey in Ardent facilities," including researching care, scheduling

[14] Loyal, https://loyalhealth.com/ (last visited July 17, 2026); *see also* Loyal, *Customer Relationship Management*, https://loyalhealth.com/customer-relationship-management/ (last visited July 21, 2026) (stating that "[e]very patient behavior across digital, clinical, and third-party sources is captured instantly and funneled into the right journey").

appointments, patient registration, and post-care communications, and would provide an "enterprise view" of appointment inventory and usage across the network.[15]

71. The Tracking Tools at issue follow the same centralized model. Each Ardent Website uses the same custom Google Analytics implementation, identified in the source code as "__ahmsGtag." This is not default Google code. It is custom code, incorporating the initials of Defendant's own name, Ardent Health Management Services, and appears throughout the Ardent Websites.

```
</style>
<script type="rocketlazyloadscript" data-rocket-src="https://lovelace.com/w
<script type="rocketlazyloadscript" data-rocket-src="https://lovelace.com/w
<link rel="https://api.w.org/" href="https://lovelace.com/wp-json/"/>
<link rel="alternate" title="JSON" type="application/json" href="https://we
<link rel="alternate" title="oEmbed (JSON)" type="application/json+oembed"
<link rel="alternate" title="oEmbed (XML)" type="text/xml+oembed" href="htt
<!-- Google tag (gtag.js) -->
<script type="rocketlazyloadscript" async data-rocket-src="https://www.goog
<script type="rocketlazyloadscript">

        window.dataLayer = window.dataLayer || [];
        function __ahmsGtag(){dataLayer.push(arguments);}
        __ahmsGtag('js', new Date());

        __ahmsGtag('config', 'G-38CKK1FPDJ', {"forceSSL":"true"});
```

```
ript type="rocketlazyloadscript" data-rocket-src="https://mountainsidemedicalcenter.com/
ript type="rocketlazyloadscript" data-rocket-src="https://mountainsidemedicalcenter.com/
nk rel="https://api.w.org/" href="https://mountainsidemedicalcenter.com/wp-json/"/>
nk rel="alternate" title="JSON" type="application/json" href="https://web.archive.org/we
nk rel="alternate" title="oEmbed (JSON)" type="application/json+oembed" href="https://we
nk rel="alternate" title="oEmbed (XML)" type="text/xml+oembed" href="https://web.archive
- Google tag (gtag.js) -->
ript type="rocketlazyloadscript" async data-rocket-src="https://www.googletagmanager.com
ript type="rocketlazyloadscript">

        window.dataLayer = window.dataLayer || [];
        function __ahmsGtag(){dataLayer.push(arguments);}
        __ahmsGtag('js', new Date());

        __ahmsGtag('config', 'G-5RKZMJDW5F', {"forceSSL":"true"});
```

```
        window.dataLayer = window.dataLayer || [];
        function __ahmsGtag(){dataLayer.push(arguments);}
        __ahmsGtag('js', new Date());

        __ahmsGtag('config', 'G-6V8QCXF576', {"forceSSL":"true"});

</script>
<!-- Google Tag Manager -->
<script type="rocketlazyloadscript">
    (function(w,d,s,l,i){w[l]=w[l]||[];w[l].push({'gtm.start':
        new Date().getTime(),event:'gtm.js'});var f=d.getElementsByTagName(s)[0],
        j=d.createElement(s),dl=l!='dataLayer'?'&l='+l:'';j.async=true;j.src=
        'https://web.archive.org/web/20251217021620/https://www.googletagmanager.com/gtm.js?id='+i+dl;f.p
        })(window,document,'script','dataLayer','GTM-PHBRXC3Q');
</script>
<!-- End Google Tag Manager -->
<script type="importmap" id="wp-importmap">
    {
        "imports": {
            "@wordpress\/interactivity": "https:\/\/web.archive.org\/web\/20251217021620\/https:\/\/uthealthe
        }
    }</script>
<script type="rocketlazyloadscript" data-rocket-type="module" data-rocket-src="https://uthealtheasttexas.com/
<link rel="modulepreload" href="https://web.archive.org/web/20251217021620jm_/https://uthealtheasttexas.com/w
<style class="wp-fonts-local">
```

***Figure 1. Exemplar source code from the Lovelace Health System, Hackensack Meridian Mountainside Medical Center and UT Health East Texas Websites showing their custom "_ahmsGtag" function used to initialize and configure Google Analytics***

---

[15] Press Release, Ardent Health, *Loyal and Ardent Health Services Establish Partnership to Engage Patients and Improve Care* (June 1, 2023), https://ardenthealth.com/our-stories/loyal-and-ardent-health-services-establish-partnership-engage-patients-and-improve-care (last visited July 21, 2026).

72. Each Ardent Website also uses the same Google Tag Manager container ID, "GTM-PHBRXC3Q." A Google Tag Manager container specifies the tracking tags that operate on a website and the triggers that cause those tags to activate. By deploying the same container across the Ardent Websites, Defendant can centrally configure, deploy, and modify the Tracking Tools operating on each Website. The Tracking Tools are deployed through this shared container.

| | |
|---|---|
| :authority | www.googletagmanager.com |
| :method | GET |
| :path | /gtm.js?id=GTM-PHBRXC3Q |
| :scheme | https |
| Accept | */* |
| Accept-Encoding | gzip, deflate, br, zstd |
| Accept-Language | en-US,en;q=0.9 |
| Cache-Control | no-cache |
| Pragma | no-cache |
| Referer | https://lovelace.com/ |

| | |
|---|---|
| :authority | www.googletagmanager.com |
| :method | GET |
| :path | /gtm.js?id=GTM-PHBRXC3Q |
| :scheme | https |
| Accept | */* |
| Accept-Encoding | gzip, deflate, br, zstd |
| Accept-Language | en-US,en;q=0.9 |
| Cache-Control | no-cache |
| Pragma | no-cache |
| Referer | https://hillcrest.com/ |

| | |
|---|---|
| :authority | www.googletagmanager.com |
| :method | GET |
| :path | /gtm.js?id=GTM-PHBRXC3Q |
| :scheme | https |
| Accept | */* |
| Accept-Encoding | gzip, deflate, br, zstd |
| Accept-Language | en-US,en;q=0.9 |
| Cache-Control | no-cache |
| Pragma | no-cache |
| Referer | https://bsahs.org/ |

***Figure 2. Exemplar screenshots showing that the Lovelace, Hillcrest and BSA Health System Websites load the same Google Tag Manager container, identified as GTM-PHBRXC3Q.***

73. The Ardent Websites also use the same custom WordPress theme, identified in their source code as "ardent-health-ms," and share substantially identical structures and visual layouts. Most, if not all, of the Websites also direct users to a "Use of Cookies" page hosted on Defendant's corporate domain, rather than to a policy maintained by the individual hospital or hospital system. These common code, design, and policy features further demonstrate Defendant's centralized administration of the Websites.

| | |
|---|---|
| Request URL | https://lovelace.com/wp-content/themes/ardent-health-ms/assets/c 9524856 |
| Request Method | GET |
| Status Code | 200 OK (from memory cache) |
| Remote Address | 192.124.249.58:443 |
| Referrer Policy | strict-origin-when-cross-origin |

| | |
|---|---|
| Request URL | https://uthealtheasttexas.com/wp-content/themes/ardent-health-ms/assets/j s.js?ver=1776941735 |
| Request Method | GET |
| Status Code | 200 OK |
| Remote Address | 192.124.249.11:443 |
| Referrer Policy | strict-origin-when-cross-origin |

| | |
|---|---|
| Request URL | https://mountainsidemedicalcenter.com/wp-content/themes/ardent-health-ms/assets/ enu.min.css?ver=1749524856 |
| Request Method | GET |
| Status Code | 200 OK (from memory cache) |
| Remote Address | 192.124.249.67:443 |
| Referrer Policy | strict-origin-when-cross-origin |

***Figure 3. Source Code from the Ardent Websites showing their shared custom WordPress theme, identified as "ardent-health-ms."***

74. Defendant therefore did not merely provide general management services to hospitals that independently selected and implemented their own Tracking Tools. Defendant developed the common tracking architecture, configured the shared tag-management container, and deployed the Tracking Tools across all the Ardent Websites.

75. By designing and deploying the code that caused patients' communications to be acquired and disclosed to third parties, Defendant intentionally intercepted Users' electronic communications.

## F. Defendant's Uniform Method of Transmitting Plaintiff's and Class Members' Private Information via the Tracking Tools

76. Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the internet. Each "client

device" (such as computer, tablet or smartphone) accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser and Microsoft's Edge browser).

77. Every website is hosted by a computer "server" that holds the website's contents and through which the entity that operates and controls the website exchanges communications with internet users' client devices via their web browsers.

78. Web communications consist of Hypertext Transfer Protocol ("HTTP") or Hypertext Transfer Protocol Secure ("HTTPS") Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **HTTP Request**: an electronic communication sent from the client device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **Cookies**: a small text file that can be used to store information on the client device, which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from client devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **HTTP Response**: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.[16]

79. A patient's HTTP Request essentially asks one of Defendant's Websites to retrieve certain information, and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons and other features that appear on the patient's

[16] One browsing session may consist of hundreds or thousands of individual HTTP Requests and HTTP Responses.

screen as they navigate the Website).

80. All the Websites contain Markup and "Client-Side Code."

81. Client-Side Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

82. Client-Side Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

83. Defendant's Tracking Tools consist of embedded third-party JavaScript that does just that. The Tracking Tools act much like a traditional wiretap by surreptitiously transmitting a Website User's communications and inputs to third parties.

84. When patients visit one of Defendant's Websites via an HTTP Request to Defendant's server, Defendant's server sends an HTTP Response (including the Markup) that displays the webpage visible to the user, along with Client-Side Code (including Defendant's Tracking Tools).

85. Thus, Defendant is in essence handing patients a wire-tapped device. Once the webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the webpage to trigger the Tracking Tools, which intercept those communications—intended only for Defendant—and transmit them to third-parties, including but not limited to Google.

86. Third parties, like Google, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third party can uniquely identify the patient associated

with the personal information intercepted (in this case, highly sensitive Private Information).

87. The third parties to whom a website transmits data through tracking tools are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.*, to bolster profits).

88. Thus, without any knowledge, authorization, or action by a user, website owners like Defendant can use their Tracking Tools to commandeer a User's computing device, causing the device to contemporaneously and invisibly redirect the Users' communications to third parties.

89. In this case, Defendant employed the Tracking Tools to intercept, duplicate and redirect Users' Private Information to third parties.

90. Anyone who visits one of Defendant's Websites is presented with a search bar and buttons that provide the following options: "Find a Provider," "Services," "Patients & Visitors," and "Locations." Following that, patients can click to view a doctor's profile, which includes information about that doctor and patient reviews. From that page, patients can click to call for an appointment.

91. For example, as shown in Figure 4 below, from the Lovelace Health System website, if a patient clicks "Find a Provider," and searches for "cardiology" from the search bar, they will receive a list of links to featured pages and related providers, among other links. From there, a patient can click on a relevant provider's page, call the provider, or log in to MyChart to schedule an appointment. At every stage, the Tracking Tools implemented in the Defendant's source code automatically track and transmit Users' communications, contemporaneously and without the Users' knowledge. The Tracking Tools installed by Defendant on all the Websites operate in the same or substantially the same manner.




***Figure 4. Search results for "Cardiology" in the "Find a Provider" search bar***

92. Figure 5 depicts the tracking activity that occurs when a User searches for "cardiology" using the "Find a Provider" search feature shown in Figure 4. At that time, the Tracking Tools embedded in Defendant's source code record and transmit information reflecting the User's search term and interaction with the search function, along with associated unique identifiers, to Google for analytics and advertising purposes.

| | |
|---|---|
| npa | 0 |
| dma | 0 |
| gdid | dY2Q2ZW |
| _eu | AEAAAGQC |
| ae | a |
| are | 1 |
| cid | 144208579.1782838997 |
| frm | 0 |
| pscdl | noapi |
| rcb | 9 |
| sr | 1920x1080 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;149.0.7827.201\|Chromium;149.0.7827.201\|Not)A%3BBrand;24.0.0.0 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| ul | en-us |
| gaf | 2 |
| _s | 3 |
| tag_exp | 115938466~115938468~118897921~118897931~119027224~119576881~119576885~119576891~119576895 |
| dl | https://lovelace.com/find-a-provider/?specialties=cardiology |
| dr | https://lovelace.com/find-a-provider/?specialties=neurology |
| sid | 1783452510 |
| sct | 3 |
| seg | 1 |
| dt | Find a Provider - Lovelace Health System |
| _tu | CA |
| en | page_view |
| ep.content_group | Find a Provider |
| _et | 22504 |
| tfd | 81175 |

***Figure 5. Tracker contemporaneously transmits contents of "Cardiology" search to Google.***

93. Figure 6 shows the User-facing webpage that appears after a User selects a provider from the search results, displaying the provider's profile, biography, and options to contact the provider.




***Figure 6. User view after clicking on Eliana Acosta, NP from "Cardiology" "Find a Provider" search results.***

94. Figure 7 depicts the tracking activity that occurs when the physician profile shown in Figure 6 loads. At that time, the Tracking Tools embedded in Defendant's Websites automatically transmit information about the specific page viewed and the User's interaction and selection, along with unique identifiers, to Google for analytics and advertising purposes.

| | |
|---|---|
| npa | 0 |
| dma | 0 |
| gdid | dY2Q2ZW |
| _eu | AAAAAGQC |
| are | 1 |
| cid | 144208579.1782838997 |
| frm | 0 |
| pscdl | noapi |
| rcb | 3 |
| sr | 1920x1080 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%2520Chrome%3B149.0.7827.201%7CChromium%3B149.0.7827.201%7CNot)A%253BBrand%3B24.0.0.0 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| ul | en-us |
| gaf | 2 |
| tag_exp | 115616985~115938466~115938468~118826210~118897921~118897931~119027224~119576881~119576885~119576891~119576895 |
| sid | 1783452510 |
| sct | 3 |
| seg | 1 |
| dl | https%3A%2F%2Flovelace.com%2Ffind-a-provider%2Fprovider%2F1134902109 |
| dr | https%3A%2F%2Flovelace.com%2Ffind-a-provider%2F%3Fspecialties%3Dcardiology |
| dt | Eliana%20Acosta%2C%20NP |
| _tu | CA |
| _s | 1 |
| tfd | 8340 |

***Figure 7. Tracker contemporaneously transmits user's action — Clicking on Eliana Acosta, NP — to Google.***

95. From the profile page depicted in Figure 4, if a User clicks on the "Book Appointment" button, located on the right side of the screen, Defendant's Websites prompt the User to either click to call the provider or to log into their MyChart patient portal account to proceed to schedule an appointment. Meanwhile, the Tracking Tools embedded in Defendant's Websites automatically transmit unique identifiers and information reflecting that the User clicked to call Eliana Acosta, NP, from her specific profile page, along with the date, time, and related event data, to Google for analytics and advertising purposes. This disclosure is depicted in Figure 8 below.

| | |
|---|---|
| are | 1 |
| cid | 144208579.1782838997 |
| frm | 0 |
| pscdl | noapi |
| rcb | 3 |
| sr | 1920x1080 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;149.0.7827.201\|Chromium;149.0.7827.201\|Not)A%3BBrand;24.0.0.0 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| ul | en-us |
| gaf | 2 |
| _s | 3 |
| tag_exp | 115616985~115938466~115938468~118826210~118897921~118897931~119027224~119576881~119576885~119576891~119576895 |
| sid | 1783452510 |
| sct | 3 |
| seg | 1 |
| dl | https://lovelace.com/find-a-provider/provider/1134902109 |
| dr | https://lovelace.com/find-a-provider/?specialties=cardiology |
| dt | Eliana Acosta, NP |
| _tu | CA |
| en | cta_phone |
| gap.plf | 5 |
| ep.content_group | Find a Provider |
| ep.click_text | Call (505) 841-1000 |
| ep.event_funnel | low_funnel |
| ep.event_intent | visit_intent |
| ep.link_url | tel:5058411000 |
| _et | 30440 |
| tfd | 451136 |

***Figure 8. Tracking Tools transmit the User's click-to-call activity to Google.***

96. Similarly, if a User logs into their MyChart patient portal account through Defendant's Websites to book or manage an appointment or review health records, the Tracking Tools embedded in Defendant's Websites automatically transmit to Google, for analytics and advertising purposes, unique identifiers and information showing that the User has done so.

| | |
|---|---|
| are | 1 |
| cid | 144208579.1782838997 |
| frm | 0 |
| pscdl | noapi |
| rcb | 19 |
| sr | 1920x1080 |
| uaa | x86 |
| uab | 64 |
| uafvl | Google%20Chrome;149.0.7827.201\|Chromium;149.0.7827.201\|Not)A%3BBrand;24.0.0.0 |
| uam | |
| uamb | 0 |
| uap | Windows |
| uapv | 10.0.0 |
| uaw | 0 |
| ul | en-us |
| gaf | 2 |
| _s | 3 |
| tag_exp | 115616985~115938466~115938468~119027224~119576881~119576885~119576891~119576895 |
| sid | 1783452510 |
| sct | 3 |
| seg | 1 |
| dl | https://lovelace.com/ |
| dr | https://lovelace.com/find-a-provider/provider/1134902109 |
| dt | Home - Lovelace Health System |
| _tu | CA |
| en | cta_chart |
| gap.plf | 5 |
| ep.content_group | Other |
| ep.click_text | Access MyChart Review health records, contact providers, manage appointments Log In or Sign Up |
| ep.event_funnel | low_funnel |
| ep.event_intent | seek_intent |
| ep.link_url | https://mychart.lovelace.com/Authentication/Login? |
| _et | 2222 |
| tfd | 34917 |

***Figure 9. Tracking Tools transmit the User's MyChart login activity to Google.***

97. Defendant's Tracking Tools intercept and disclose to Google and other third parties both the "contents" of Users' communications on the Websites (*i.e.*, the URLs, buttons, links, pages, and tabs they view, and the information entered into the Websites' forms) and identifiers

that can uniquely identify the Users (*i.e.*, their IP addresses, cookie identifiers, device identifiers and account numbers).

98. Once a User chooses a doctor, all the information that User has submitted is automatically sent directly to third parties, including but not limited to Google. The information transmitted to third parties includes, (i) the User's search parameters, (ii) the fact that the User clicked on a specific provider's profile page, (iii) whether the User called that provider; and (iv) several categories of identifiers that can uniquely identify the User.

99. Each time Defendant sends this activity data, it also discloses a User's PII and the contents of the User's communications.

100. Thus, Defendant reveals to Google and other third parties the exact links and pages Website Users click and view and discloses extensive insight into the Users' past, present, and/or future health care, which qualifies as PHI under HIPAA. *See* 45 C.F.R. § 160.103.

101. This example highlights just one of the hundreds (if not thousands) of paths on the Websites demonstrating how Defendant's Websites surreptitiously collect and transmit Users' PHI to its third-party vendors.

102. The disclosures described above take place without Users' consent.

103. Thus, without the consent of the Users of its Websites, Defendant has effectively used its source code to commandeer Users' computing devices, thereby re-directing their Private Information to third parties.

104. The information Defendant's Tracking Tools send to Google and other third parties may include, among other things, Users' PII, PHI and other confidential information.

105. Consequently, when Users visit Defendant's Websites and communicate their Private Information, it is transmitted to Google and other third parties, including but not limited

to: (i) medical conditions and specialties searched by Users; (ii) the names and profiles of healthcare providers viewed by Users; (iii) facility locations selected or searched by Users; (iv) the content of Users' free-text searches conducted via the Website's search bar; (v) the full-string URLs of pages visited by Users, which encode and reflect the substance of Users' healthcare-related browsing activity; (vi) when Users click a provider's phone number to call for an appointment, which is captured and transmitted as a discrete tracked event; (vii) when Users click to log into their MyChart patient portal account; and (viii) Users' personal identifiers transmitted contemporaneously with the foregoing, including IP addresses and unique cookie identifiers associated with each third-parties' own Tracking Tools. The URLs transmitted to third parties further reflect when Users navigate to pages associated with scheduling appointments, contacting providers, or accessing the patient portal.

## G. Unique Personal Identifiers, Including IP Addresses, are PHI.

106. While not all entities are covered under HIPAA, the law specifically applies to healthcare providers, business associates of healthcare providers, health plans and healthcare data clearinghouses. *See* 42 U.S.C. § 1320d-1(a)-(b).[17]

107. The Privacy Rule sets forth policies to protect all individually identifiable health information that is held or transmitted.

108. HIPAA identifies at least 18 categories of identifiers that render health information individually identifiable when maintained by or disclosed from a covered entity. Such identifiers

[17] *See* Alfred Ng & Simon Fondrie-Teitler, *This Children's Hospital Network Was Giving Kids' Information to Facebook*, The Markup (June 21, 2022), https://themarkup.org/pixel-hunt/2022/06/21/this-childrens-hospital-network-was-giving-kids-information-to-facebook ("When you are going to a covered entity's website, and you're entering information related to scheduling an appointment, including your actual name, and potentially other identifying characteristics related to your medical condition, there's a strong possibility that HIPAA is going to apply in those situations.").

constitute PHI when they identify an individual or when the covered entity has actual knowledge that the information can be used alone or in combination with other information to identify an individual. *See* 45 C.F.R. § 164.514(b)(2)(i).

109. These HIPAA identifiers, as relevant here, include names, dates related to an individual, email addresses, device identifiers, web URLs and IP addresses.[18]

110. Defendant unlawfully disclosed Users' HIPAA identifiers, including their names, emails, dates they sought treatments, computer IP addresses, device identifiers and web URLs visited, to third parties through its use of the Tracking Tools, *in addition to* services selected, patient statuses, medical conditions, treatments, provider information and appointment information.

111. HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *see also id.* § 164.514(b)(2)(i)(O).

112. In addition to Users' patient statuses, medical conditions, treatment, specific providers, and appointment information, Defendant unlawfully disclosed Users' computer IP addresses to third parties like Google via the Tracking Tools.

113. An IP address is a number that identifies the address of a device connected to the Internet.

114. IP addresses are used to identify and route communications on the internet.

---

[18] U.S. Dep't of Health & Hum. Servs., *Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last visited June 23, 2026).

115. IP addresses of individual internet users are used by internet service providers, Websites, and third-party tracking companies to facilitate and track internet communications.

116. Under HIPAA, an IP address is considered PII.

117. HIPAA defines PII to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses. *See* 45 C.F.R. § 164.514(2).

118. Consequently, Defendant's disclosure of Users' IP addresses violated HIPAA and industry-wide privacy standards.

119. In addition to the substantive health-related information described above, Defendant disclosed to Google and other third parties a series of unique identifying codes associated with Users' Website interactions, including persistent cookie identifiers, device identifiers, and other tracking IDs assigned by third-party Tracking Tools.

120. These unique identifying codes include, among others, Google advertising and analytics cookies such as IDE, DSID, NID, SID, __Secure-3PSID, __Secure-3PAPISID, and __Secure-3PSIDCC, and the AdTheorent tracking identifier, adtheorent[cuid], which all function as persistent identifiers that allow these third party vendors to distinguish, recognize, and track a specific User or User device across browsing sessions and across websites.

121. Under HIPAA, "individually identifiable health information" expressly includes not only traditional identifiers like names or medical record numbers, but also "any other unique identifying number, characteristic, or code" that can be used to identify an individual or for which there is a reasonable basis to believe the information can be used to identify the individual. 45 C.F.R. § 160.103; *id.* § 164.514(b)(2)(i).

122. HIPAA's de-identification rule makes clear that information is not de-identified if it includes device identifiers, IP addresses, URLs, or other unique identifying codes, or if the

covered entity has actual knowledge that the information could be used—alone or in combination with other information—to identify an individual. *Id.* § 164.514(b)(2).

123. Defendant knowingly disclosed these unique identifying codes alongside URLs, page content, button clicks, search terms, and other communications that directly reflect a User's interest in, pursuit of, or receipt of healthcare services, thereby allowing third parties to link those health-related communications to a specific, identifiable User.

124. Because these unique identifying codes were transmitted together with information relating to a User's health conditions, providers, appointments, or treatment inquiries, they constitute individually identifiable health information—and therefore PHI—under HIPAA.

125. Defendant's disclosure of these unique identifying codes to third parties was not incidental, anonymous, or de-identified, but instead enabled ongoing recognition, profiling, and re-identification of Users in connection with their healthcare activities, in direct contravention of HIPAA's privacy and de-identification requirements.

### H. Defendant's Privacy Policy and Promises.

126. During the statutory period, Defendant published a Code of Business Conduct and Ethics (the "Code"), governing Ardent and its affiliated healthcare providers, that is available to the public through its website.[19] Defendant described the Code as a "practical resource meant to guide our decisions and actions," that "applies to all of us at Ardent," and expressly applies to "affiliated healthcare providers." The Code therefore established common privacy and compliance standards throughout Ardent's network, including the hospital systems whose Websites are at issue.

127. In a section titled "We Protect Patient Confidentiality," Defendant represents that

[19] Ardent Health Services, *Ardent Health Code of Business Conduct and Ethics* (available at https://ardenthealth.com/codeofconduct) (last visited, July 21, 2026).

"Ardent protects confidential patient information and fully complies with [HIPAA]." Defendant further states that, "[t]o uphold patient confidentiality," patient information would never be disclosed or accessed unless "necessary and authorized."[20]

128. The Code also represents that "Ardent has a comprehensive HIPAA Privacy and IT Security program" applicable throughout its network. Under that program, each affiliated facility maintains HIPAA policies, designates a privacy officer, and operates a HIPAA breach and privacy committee. Defendant further represents that it continuously monitors privacy risks, tracks and reports disclosures, and permits patient information to be transmitted only through approved systems.[21]

129. The Code thus presents patient privacy as an enterprise-wide obligation, implemented through Defendant's corporate program and the HIPAA policies maintained by each affiliated facility. Consistent with that framework, Ardent-affiliated facilities publish Notices of Health Information Privacy Practices through their respective Websites. These Notices are materially identical, are maintained through Ardent-controlled web infrastructure, and contain the same representations concerning the confidentiality and permitted disclosure of patient health information

130. For example, if a User clicks on the "Privacy Policy" button located on the Lovelace Health System landing webpage (https://lovelace.com/), then clicks on the "HIPAA Notice of Privacy Practices" button, the User is directed to a document titled "Lovelace Health System Notice of Health Information Privacy Practices." The document's URL reveals that it is maintained

---

[20] *Id.*
[21] *Id.*

and owned by Ardent.[22]

131. Likewise, if a User clicks on the "Privacy Policy" button located on any of Defendant's other affiliated provider's landing webpage, such as UT Texas Health East (https://uthealtheasttexas.com/), the User is directed to a document titled "UT Health East Texas Notice of Health Information Privacy Practices."[23] The same is true with respect to all Websites of the Ardent-affiliated facilities.

132. The UT Health East Texas and Lovelace Notices of Health Information and Privacy Practices are substantively identical, and the URL for UT Health East Texas's policy reveals that it is also maintained and owned by Ardent.[24] The same is true with respect to all Websites of the Ardent-affiliated facilities.

133. The Notices of Health Information Privacy Practices available through the each of Ardent's affiliated facilities' Websites state that the facility "will not . . . use or disclose your health information for marketing purposes or sell your health information, unless you have signed an authorization," that the facility "will only use and disclose your health information with your written authorization", and that the facility is "required by law to maintain the privacy of health information that identifies you."[25]

---

[22] Lovelace Health System, *Notice of Health Information Privacy Practices* (Apr. 2026), https://cdn.ardenthealthservices.com/lhs/wp-content/uploads/sites/8/2026/04/10173844/40194-Lovelace-Notice-of-Privacy-Practices-POSTERS-English-11x17-1.pdf.

[23] UT Health East Texas, *Notice of Health Information Privacy Practices* (Sept. 2025), https://cdn.ardenthealthservices.com/uthet/wp-content/uploads/sites/17/2025/09/09114328/38633-UT-HEALTH-Notice-of-Privacy-Practice-Updates-POSTER_PRINT_ENG.pdf.

[24] *Id.*

[25] *See* Lovelace Health System, *Notice of Health Information Privacy Practices*, available at https://lovelace.com/wp-content/uploads/sites/8/2025/04/31610-LOVELACE-LHS-HIPAA-Privacy-Notice-POSTER_17.25x23_0.pdf; *see also*, UT Health East Texas, *Notice of Health Information Privacy Practices* (Sept. 2025), https://cdn.ardenthealthservices.com/uthet/wp-

134. Consistent with the enterprise-wide privacy framework described in Defendant's Code, these materially identical Notices are published through the Ardent Websites and maintained on Ardent-controlled web infrastructure. The representations in the Notices concerning the confidentiality, use, and disclosure of patient health information therefore reflect Defendant's centralized privacy policies and are attributable to Defendant.

135. Those representations are materially misleading, given Defendant's actual practices. Defendant admits elsewhere that its Websites deploy third-party tracking technologies that intercept Users' interactions with the Websites. If a User clicks on the "Use of Cookies" button located at the bottom of *any* of Defendant's Websites, they are directed to an Ardent Health webpage, on which Defendant admits that it uses cookies on its Websites to retain certain types of "information that some websites retain for research purposes. Such information including IP address, browser type, language, date and time, location, site use and the amount of time spent on a particular page, among others."[26] Defendant states that it "may combine [this information] with [U]ser information" to "analyze information about use of our services and report on activities and trends."[27]

136. Defendant's Code and Cookie Policies and its affiliated providers' Privacy Policies do not adequately inform Users that their interactions with healthcare provider pages, appointment scheduling tools, or other health-related webpages may be transmitted to third-party advertising and analytics companies through the Tracking Tools embedded on the Websites. A reasonable User reviewing Defendant's public representations in its Code and Privacy Policies would

---

content/uploads/sites/17/2025/09/09114328/38633-UT-HEALTH-Notice-of-Privacy-Practice-Updates-POSTER_PRINT_ENG.pdf.

[26] Ardent Health, *Use of Cookies*, https://ardenthealth.com/use-of-cookies (last visited July 17, 2026).

[27] *Id.*

understand that their Private Information is not shared with advertising partners and that any marketing-related disclosures are limited to basic technical identifiers.

137. By intercepting and transmitting Users' health-care interactions, together with unique identifiers, to third-parties, Defendant disclosed information far beyond what its privacy disclosures represented. These transmissions occurred without obtaining written authorizations or informed consent from Users that Defendant's own privacy materials represent are required for marketing uses or disclosures of Users' Private Information.

## I. Federal Warning on Tracking Codes on Healthcare Websites.

138. Beyond Defendant's own policies, the federal government has issued guidance warning that tracking code like the Tracking Tools employed by the Defendant may come up against federal privacy law when installed on healthcare websites.

139. The Bulletin is clear that healthcare organizations regulated under HIPAA may use third-party tracking tools, such as the Defendant's Tracking Tools, in a limited way to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' protected health information to these vendors. [28]

140. The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[29]

141. The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or

[28] *See Use of Online Tracking Technologies by HIPAA*, *supra* note 3.
[29] *Id.* (emphasis added).

> others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI.*** Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.*** While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, ***because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.***[30]

142. The Users face exactly the risks about which the government expresses concern. Defendant has passed along Users' search terms about health conditions for which they seek medical treatment; their contacting of doctors and medical providers to make appointments; the names of their doctors and medical providers; the frequency with which they take steps relating to obtaining healthcare for certain conditions and where they seek medical treatment.

143. This information is, as described by the Bulletin, "highly sensitive." The Bulletin goes on to make clear how broad the government's view of protected information is as it explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, ***or any unique identifying code.***[31]

144. Crucially, that paragraph in the government's Bulletin continues:

> IIHI [individually identifiable health information] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services . . . [for example,] if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, ***the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and***

[30] *Id.* (emphasis added).
[31] *Id.* (emphasis added).

***related to the individual's health or future health care.***[32]

145. The Bulletin reminds healthcare organizations regulated under the HIPAA that they may use third-party tracking tools, such as the Google Tracking Tools, only in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors.[33]

146. The federal government is taking these violations of health data privacy and security seriously, as recent, high-profile Federal Trade Commission ("FTC") settlements against several telehealth companies demonstrate.

147. For example, in 2021 and 2023, the FTC imposed a $1.5 million penalty on GoodRx for violating federal law by sharing its customers' sensitive PHI with advertising companies and platforms, including Facebook and Google. The FTC also reached a $7.8 million settlement with the online counseling service BetterHelp, resolving allegations that the company shared customer health data with Facebook and Snapchat for advertising purposes. Likewise, the FTC reached a settlement with Flo Health, Inc. related to information about fertility and pregnancy that Flo fertility-tracking app was improperly sharing with Facebook, Google and other third parties. And Easy Healthcare was ordered to pay a $100,000 civil penalty for violating the Health Breach Notification Rule when its ovulation tracking app Premom shared health data for advertising purposes.[34]

---

[32] *Id.* (emphasis added).

[33] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, *supra* note 3.

[34] *See FTC Enforcement Action to Bar GoodRx from Sharing Consumers' Sensitive Health Info for Advertising, Fed. Trade Comm'n* (Feb. 1, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/02/ftc-enforcement-action-bar-goodrx-sharing-consumers-sensitive-health-info-advertising; *FTC Gives Final Approval to Order Banning BetterHelp from Sharing Sensitive Health Data for Advertising, Requiring It to Pay $7.8 Million*, Fed. Trade Comm'n (July 14, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-gives-final-

148. Even more recently, in July 2023, federal regulators sent a letter to approximately 130 healthcare providers, warning them about using online tracking technologies that could result in unauthorized disclosures of Private Information to third parties. The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook Pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others." According to the letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[35]

149. This is further evidence that the data Defendant chose to disclose is protected Private Information, and the disclosure of that information was a violation of Users' rights.

**J. Defendant is Subject to HIPAA.**

150. Defendant is subject to HIPAA as a business associate of the Ardent-affiliated hospitals and healthcare providers it manages. Defendant publicly describes itself as "a healthcare management company" that "provides various management and administrative services to

---

approval-order-banning-betterhelp-sharing-sensitive-health-data-advertising; *Ovulation Tracking App Premom Will be Barred from Sharing Health Data for Advertising Under Proposed FTC Order*, Fed. Trade Comm'n (May 17, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/05/ovulation-tracking-app-premom-will-be-barred-sharing-health-data-advertising-under-proposed-ftc; *FTC Finalizes Order with Flo Health, a Fertility-Tracking App that Shared Sensitive Health Data with Facebook, Google, and Others*, Fed. Trade Comm'n (June 22, 2021), https://www.ftc.gov/news-events/news/press-releases/2021/06/ftc-finalizes-order-flo-health-fertility-tracking-app-shared-sensitive-health-data-facebook-google (last visited June 23, 2026).

[35] *See Use of Online Tracking Technologies by HIPAA*, *supra* note 3.

hospitals and healthcare delivery locations affiliated with Ardent Health, Inc."[36]

151. HIPAA defines a "business associate" to include an entity that provides "management [or] administrative" services to a covered entity where those services involve the disclosure of PHI.[37] The definition also includes an entity that, on behalf of a covered entity, "creates, receives, maintains, or transmits [PHI]."[38]

152. As alleged herein, Defendant centrally owns, operates, and administers the Ardent Websites on behalf of Ardent-affiliated hospitals and healthcare providers. In performing those services, Defendant designed and controlled the Websites' digital infrastructure, collected patients' communications containing protected health information, and caused those communications and associated identifiers to be transmitted to third parties. Defendant therefore created, received, maintained, or transmitted PHI while providing management and administrative services to covered healthcare providers and qualifies as their business associate under HIPAA.

**K. Defendant's Use of the Tracking Tools Violated HIPAA.**

153. As a business associate of the Ardent-affiliated covered entities, Defendant is directly subject to HIPAA's requirements governing business associates' uses and disclosures of protected health information.[39]

154. Under federal law, a covered entity or business associate may not use or disclose

---

[36] *AHS Management Co., Inc., Terms & Conditions of Use*, Ardent Health, https://ardenthealth.com/terms-of-use (last visited July 17, 2026) (stating that AHS "provides various management and administrative services to hospitals and healthcare delivery locations affiliated with Ardent Health, Inc.").
[37] 45 C.F.R. § 160.103.
[38] *Id.*
[39] 42 U.S.C. § 17934(a); *id.* § 1320d-6; 45 C.F.R. § 164.502(a)(3).

PHI for marketing purposes without the individual's express written authorization.[40]

155. HHS instructs covered entities that patient status itself is protected by HIPAA.

156. The Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and either (i) "identifies the individual;" or (ii) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

157. The Privacy Rule broadly defines PHI as individually identifiable health information that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." *Id.*

158. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (i) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'" or (ii) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

A. Names; . . .

H. Medical record numbers; . . .

J. Account numbers; . . .

M. Device identifiers and serial numbers;

---

[40] 42 U.S.C. § 1320d-6; 45 C.F.R. §§ 164.502(a)(3), 164.504(e)(2)(i), 164.508(a)(3), 164.514(b)(2)(i), 164.508(c)(1)(vi).

N. Web Universal Resource Locators (URLs);

O. Internet Protocol (IP) address numbers; . . . and

P. Any other unique identifying number, characteristic, or code . . . and the covered entity must not have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information.[41]

159. HIPAA requires covered entities to maintain appropriate administrative, technical, and physical safeguards to protect PHI and requires business-associate agreements to obligate business associates to use appropriate safeguards to prevent unauthorized uses or disclosures.[42] HIPAA also prohibits covered entities and business associates from using or disclosing PHI, except as permitted or required by HIPAA rules. *See id.* § 164.502(a).

160. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, is considered PHI.

161. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[43]

162. Consistent with this restriction, HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before

---

[41] *See* 45 C.F.R. § 160.514.
[42] *Id.* §§ 164.504(e)(2)(ii)(B); 164.530(c).
[43] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/special-topics/de-identification/index.html (last visited July 30, 2026).

a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[44]

163. Here, as described *supra*, Defendant provided Users' information to third parties in violation of the Privacy Rule. An individual or corporation violates the Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320(d)(6).

164. The statute states that a "person . . . shall be considered to have obtained or disclosed individually identifiable health information . . . if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id.*

165. Violation of 42 U.S.C. § 1320(d)(6) is subject to criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." *Id.* § 1320(d)(6)(b). In such cases, an entity that knowingly obtains individually identifiable health information relating to an individual "shall be fined not more than $250,000, imprisoned not more than 10 years, or both." *Id.* § 1320(d)(6)(b)(1).

166. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of

[44] *Marketing*, U.S. Dep't of Health & Human Servs., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last visited June 23, 2026).

electronic [PHI]," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic [PHI] to allow access only to those persons or software programs that have been granted access rights," *id.* § 164.312(a)(1)—which Defendant failed to do.

167. As a business associate, Defendant was required to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic [PHI]," and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic [PHI] to allow access only to those persons or software programs that have been granted access rights," which Defendant failed to do. *See* 45 C.F.R. §§ 164.306(e), 164.312(a)(1).

168. As a business associate, Defendant could use or disclose PHI only as permitted or required by its business-associate agreements or as required by law; it could not use or disclose PHI in a manner that would violate the Privacy Rule if done by the affiliated covered entities. Because the affiliated covered entities could not use or disclose PHI for marketing without the individual's authorization, Defendant likewise could not do so. *See id.* §§ 164.502(a)(3), 164.504(e)(2)(i), 164.508(a)(3)(i).

169. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a) Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b) Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.F.R. § 164.308(a)(1); and

c) Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R.

§ 164.306(a)(3).

170. In disclosing the content of Users' communications, Defendant had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions.

171. Defendant's placement of third-party Tracking Tools on its Websites is a violation of Users' privacy rights under federal law. While Plaintiff does not bring a claim under HIPAA itself, this violation demonstrates Defendant's wrongdoing relevant to other claims and establishes its duty to maintain patient privacy.

**L. Users' Reasonable Expectation of Privacy.**

172. Users were aware of the confidentiality obligations and assurances applicable to Lovelace Health System and the other Ardent-affiliated healthcare providers when they sought medical services from those providers through Defendant's Websites.

173. Indeed, when Users provided Private Information to Lovelace Health System and the other Ardent-affiliated healthcare providers through Defendant's Websites, they reasonably expected that information to remain private and that Defendant would not disclose it to third parties for commercial purposes unrelated to patient care.

174. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative consent before a company collects and shares its customers' data to be one of the most important privacy rights.

175. For example, a recent Consumer Reports study shows that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should

be required to provide consumers with a complete list of the data that is collected about them.[45]

176. Personal data privacy and obtaining consent to share Private Information are material to Users.

177. Users' reasonable expectations of privacy in their Private Information are grounded in, among other things, Defendant's status as a HIPAA business associate, Defendant's obligation to maintain the confidentiality of patients' Private Information, state and federal laws protecting the confidentiality of medical information, state and federal laws protecting the confidentiality of communications and computer data, state laws prohibiting the unauthorized use and disclosure of personal means of identification, and Defendant's express promises of confidentiality.

**M. Users' Private Information Has Substantial Financial Value.**

178. Users' Private Information has substantial value. Defendant's disclosure and interception harmed Users by not compensating them for the value of their Private Information and diminishing the value of their Private Information

179. The value of personal data is well understood and generally accepted as a form of currency. It is now incontrovertible that a robust market for this data undergirds the technology economy.

180. Healthcare data is particularly valuable on the black market because it often contains all an individual's PII and medical conditions, as opposed to a single piece of information that may be found in a financial breach.

181. Healthcare data is incredibly valuable, because unlike a stolen credit card that can be easily canceled, most people are unaware that their medical information has been sold. Once it

---

[45] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds,* Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/.

has been detected, the damage caused can be irreparable.

182. The value of health data is well-known, and various reports have been conducted to identify its value.

183. Specifically, in 2023, the Value Examiner published a report titled "Valuing Healthcare Data." The report focused on the rise in providers, software firms and other companies that are increasingly seeking to acquire clinical patient data from healthcare organizations. The report cautioned providers that they must de-identify data and that purchasers and sellers of "such data should ensure it is priced at fair market value to mitigate any regulatory risk."[46]

184. Trustwave Global Security published a report entitled "The Value of Data." With respect to healthcare data records, the report found that they may be valued at up to $250 per record on the black market, compared to $5.40 for the next-highest-value record (a payment card).[47]

185. The value of health data has also been reported extensively in the media. For example, *Time Magazine* published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[48]

186. Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who

---

[46] *See Valuing Healthcare Data* (white paper), Health Capital (Dec. 2017), https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf.

[47] *See Healthcare Data: The New Prize for Hackers*, Imprivata (Nov. 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers.

[48] *See* Alice Park & Brian Everstine, *How the Medical-Data Industry Sells Your Records — and Why Doctors Can't Stop It*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

compile the data from providers and other health-care organizations and sell it to buyers."[49]

187. The dramatic difference in the price of healthcare data compared to other forms of private information commonly sold evidences the value of PHI.

188. These rates are assumed to be discounted because they do not operate in competitive markets, but rather, in an illegal marketplace. If a criminal can sell other internet users' stolen data, surely internet users can sell their own data.

189. Google's and others' practices of using such information to package groups of people as "Lookalike Audiences"[50] and similar groups and selling those packages to advertising clients demonstrates the financial worth of that data.

190. Data harvesting is the fastest growing industry in the nation.

191. As software, data mining and targeting technologies have advanced, the revenue from digital ads and the consequent value of the data used to target them have risen rapidly.

192. Consumer data is so valuable that some have proclaimed that data is the new oil.

193. Between 2016 and 2018, the value of information mined from Americans increased by 85% for Facebook and 40% for Google.

194. Overall, the value internet companies derive from Americans' personal data increased almost 54% and is only expected to continue growing in the coming years.

195. Conservative estimates suggest that in 2018, internet companies earned $202 per American user. By 2020, that value had jumped to approximately $420 per adult American user

---

[49] *See* Lauren Hirsch, *Hospital Execs Say They're Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

[50] *Lookalike audiences*, Display & Video 360 Help, https://support.google.com/displayvideo/answer/15612398?hl=en (last visited May 12, 2026) ("Lookalike audiences are groups of people that share characteristics with others on an existing 'seed' list . . . find other potential customers with similar characteristics.").

each year, making personal data sales a nearly $140 million industry.[51]

196. In 2025, the global big data market was projected to be valued at approximately $224.46 billion.[52]

197. As to health data specifically, as detailed in an article in Canada's National Post:

> As part of the multibillion-dollar worldwide data brokerage industry, health data is one of the most sought-after commodities. De-identified data can be re identified (citing https://www.nature.com/articles/s41467-019-10933-3/) and brazen decisions to release records with identifiable information (citing https://www.wsj.com/articles/hospitals-give-tech-giants-access-todetailed-medical-records-11579516200?mod=hp_lista_pos3) are becoming commonplace.[53]

198. Further demonstrating the financial value of Class Members' medical data, CNBC has reported that hospital executives have received a growing number of bids for user data:

> Hospitals, many of which are increasingly in dire financial straits, are weighing a lucrative new opportunity: selling patient health information to tech companies. Aaron Miri is chief information officer at Dell Medical School and University of Texas Health in Austin, so he gets plenty of tech start-ups approaching him to pitch deals and partnerships. Five years ago, he'd get about one pitch per quarter. But these days, with huge data-driven players like Amazon and Google making incursions into the health space, and venture money flooding into Silicon Valley start-ups aiming to bring machine learning to health care, the cadence is far more frequent. "It's all the time," he said via phone. "Often, once a day or more."
>
> * * *
>
> [H]ealth systems administrators say [the data] could also be used in unintended or harmful ways, like being cross-referenced with other data to identify individuals at higher risk of diseases and then raise their health premiums, or to target advertising

---

[51] Pawtocol, *How Much Is User Data Worth?*, Medium (Mar. 16, 2020), https://pawtocol.medium.com/how-much-is-user-data-worth-f2b1b0432136.

[52] Market Data Forecast, *Big Data Market Size, Share, Trends & Analysis, 2033* (Sept. 25, 2025), https://www.marketdataforecast.com/market-reports/big-data-market (projecting the global big data market to grow from a 2024 value of USD 199.63 billion to an estimated USD 224.46 billion in 2025).

[53] *See* Iris Kulbatski, *The Dangers of Electronic Health Records*, National Post (Feb. 26, 2020), https://nationalpost.com/opinion/iris-kulbatski-the-dangers-of-electronic-health-records.

to individuals.[54]

199. The CNBC article also explained:

> De-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers. Just one company alone, IQVIA, said on its website that it has access to more than 600 million patient records globally that are nonidentified, much of which it accesses through provider organizations. The buyers, which include pharma marketers, will often use it for things like clinical trial recruiting But hospital execs worry that this data may be used in unintended ways, and not always in the patient's best interest.

200. Tech companies are under particular scrutiny, because they already have access to a massive trove of information about people, which they use to serve their own needs. For instance, the health data Google collects could eventually help it micro-target advertisements to people with particular health conditions. Policymakers are proactively calling for a revision and potential upgrade of HIPAA privacy rules, out of concern for what might happen as tech companies continue to march into the medical sector.[55]

201. *Time Magazine* similarly, in an article titled, "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry," referenced the "growth of the big health data bazaar," in which patients' health information is sold. It reported that:

> [T]he secondary market in information unrelated to a patient's direct treatment poses growing risks, privacy experts say. That's because clues in anonymized patient dossiers make it possible for outsiders to determine your identity, especially as computing power advances in the future.[56]

202. This economic value of this data has been leveraged largely by corporations who

---

[54] *See* Lauren Hirsch, *Hospital Execs Say They're Getting Flooded with Requests for Your Health Data*, CNBC (Dec. 18, 2019), https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.
[55] *Id.*
[56] *See* Alice Park & Brian Everstine, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, Time (Oct. 17, 2016), https://time.com/4588104/medical-data-industry/.

pioneered the methods of its extraction, analysis and use. However, the data also has economic value to internet users. Market exchanges have sprung up where individual users like Plaintiff can sell or monetize their own data. For example, Nielsen Data and Mobile Computer will pay internet users for their data.[57]

203. There are countless examples of this kind of market, which is growing more robust as information asymmetries are diminished through revelations to users as to how their data is being collected and used.

204. In short, there is a quantifiable economic value to internet users' data that is greater than zero. The exact number will be a matter for experts to determine.

205. Defendant gave away its Users' communications and transactions on its Websites without permission.

206. The unauthorized access to Users' Private Information has diminished the value of that information, resulting in harm to Users of Defendant's Websites, including Plaintiff and Class Members.

207. Plaintiff has a continuing interest in ensuring that her future communications with Defendant are protected and safeguarded from future unauthorized disclosure.

**N. Defendant was Enriched and Benefitted from the Use of the Tracking Tools and Unauthorized Disclosures.**

208. Defendant intentionally deployed and configured the Tracking Tools on the Websites to disclose its Users' Private Information to third parties for marketing, commercial advantage, and profit, a benefit Defendant could obtain only through the knowing disclosure of that Private Information.

[57] *See 10 Apps for Selling Your Data for Cash,* WalletHacks, https://wallethacks.com/apps-for-selling-your-data/ (last visited June 23, 2026).

209. In exchange for disclosing the Private Information of its Users, Defendant is compensated by third party vendors like Google in the form of enhanced advertising services and more cost-efficient marketing on its platforms.

210. After receiving Users' Private Information communicated on the Websites, third party vendors forward this data, and their analysis of this data, to Defendant.

211. Defendant then uses this data and analysis for its own commercial purposes that include understanding how Users utilize its Websites.

212. Defendant also receives an additional commercial benefit from using third party Tracking Tools, such as the Google DoubleClick, namely being able to serve more targeted advertisements to existing and prospective Users on their Google accounts.

213. Google advertises its Tracking Tools as follows: "when you visit a website that uses [our] advertising services . . . your web browser automatically sends certain information to Google. This includes the URL of the page you're visiting and your IP address. We may use the IP address, for example, to identify your general location, to measure the effectiveness of ads, and, depending on your settings, to improve the relevance of the ads you see. We may also set cookies on your browser or read cookies that are already there."[58]

214. Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. It operates through code and tracking technology placed on a website and cookies to track website visitors and then places ads on other websites the visitor goes to later.[59]

---

[58] *How Google uses information from sites or apps that use our services*, Privacy & Terms, https://policies.google.com/technologies/partner-sites (last visited June 23, 2026).

[59] The Complex World of Healthcare Retargeting, Medico Digital (July 10, 2023), https://www.medicodigital.com/insights/the-complicated-world-of-healthcare-retargeting/ (last visited June 23, 2026).

215. The process of increasing conversions and retargeting occurs in the healthcare context by sending a successful action on a healthcare website back to Google via the Google Tracking Tools and the tag embedded on, in this case, Defendant's Websites. For example, when a User searches for doctors, medical conditions or treatment on the Websites, that information is sent to Google Ads via the conversion tracking tag and associated cookies. Google can then use its data on the User to find more users to click on one of Defendant's ads and ensure that those Users targeted are more likely to convert.[60]

216. Through this process, the Google Tracking Tools embedded on Defendant's Websites record and transmit information about a User's activity when the User loads and interacts with the Websites. As Google explains, when a User completes or triggers a defined action on a website, the Google tag or conversion tracking code reads existing cookies and sends information about the page visited and the action taken back to Google for advertising and measurement purposes. The data transmitted includes the URLs of pages visited and the specific actions taken on the website, which, in the healthcare context, may reflect an individual's interest in or pursuit of medical services.[61]

217. Users' Private Information has considerable value as highly monetizable data, especially insofar as it allows companies to gain insight into their customers so that they can perform targeted advertising and boost their revenues.

218. As alleged above, Defendant's use of the Tracking Tools was not incidental or

---

[60] *See,* WordStream, *How Does Google Remarketing Work?* (explaining that placing Google remarketing code or tag on a website allows advertisers to add visitors to remarketing audiences via browser cookies and then serve targeted Google Ads to those visitors as they browse other sites to increase conversions), https://www.wordstream.com/google-remarketing (last visited June 23, 2026).

[61] *Id.*

merely technical. Defendant intentionally caused Users' Website communications to be disclosed to Google and other third parties, obtained commercial benefits from those disclosures, and diminished the value and confidentiality of the Private Information disclosed. The following allegations describe how Plaintiff personally used one of Defendant's Websites and how her Private Information was intercepted and disclosed through that same tracking process.

**MS. BORRETT'S EXPERIENCES**

219. In connection with the healthcare services she received from Lovelace Health System, Plaintiff disclosed her Private Information through Defendant's Website, *https://lovelace.com,* on numerous occasions, most recently in May 2025.

220. Ms. Borrett accessed https://lovelace.com on her phone to communicate with Lovelace Health System and obtain information and services related to her healthcare. Defendant owned, controlled, maintained and operated the Lovelace Website through which these communications occurred.

221. During the relevant time period, when Defendant's Tracking Tools were present, Ms. Borrett used Defendant's website, https://lovelace.com/, to contact and call specific medical providers and facilities, research medical conditions, and login to MyChart. The full scope of Defendant's interceptions and disclosures of Ms. Borrett's communications to third parties, including but not limited to Google, can only be determined through formal discovery. However, Defendant intercepted and transmitted to third parties via the Tracking Tools at least the long-URLs or substantially similar URL communications about Ms. Borrett's prospective healthcare identified in Exhibit A.[62]

[62] The unredacted copy of Exhibit A contains Plaintiff's PHI, which is confidential and may not be publicly disclosed. By separate motion, Plaintiff seeks to file the unredacted copy of Exhibit A under seal.

222. Contemporaneously with its interception and transmission of Ms. Borrett's communications on *https://lovelace.com/,* Defendant also disclosed to third parties Ms. Borrett's personal identifiers, including but not limited to her IP addresses, cookie identifiers, device identifiers and account identifiers.

223. Ms. Borrett was never notified by Defendant, Lovelace Health System, or any of Defendant's other affiliated providers that Defendant and third parties would put individually identifiable patient health information about her past, present, or future health conditions to its own commercial uses. Ms. Borrett never provided informed consent or written permission allowing Defendant to send individually identifiable patient health information about her past, present, or future health conditions to third parties. Ms. Borrett never provided informed consent or written permission allowing Defendant or any third party to put individually identifiable patient health information about her past, present, or future health conditions to their own commercial use.

213. After using one of Defendant's Websites and communicating her Private Information, Plaintiff received advertisements for Defendant's services on Facebook. Plaintiff did not consent to Defendant's use or disclosure of her Private Information for advertising or marketing purposes.

214. Google maintains records of the advertisements it serves to individual users and their devices. Ms. Borrett will seek in discovery the records reflecting the ads related to her medical conditions and treatments that were delivered to her and the Class Members, along with associated targeting and delivery data, to fully inform the scope of their claims and damages and the ways in which their Private Information was used for advertising.

215. Ms. Borrett provided Private Information to Lovelace Health System through Defendant's Website and trusted that the information would be safeguarded in accordance with

applicable privacy policies and state and federal law.

216. Ms. Borrett reasonably expected that her healthcare-related communications with Lovelace Health System through Defendant's Website would remain confidential and would not be transmitted to or intercepted by third-party analytics vendors.

217. By doing so without her consent, Defendant breached its Code of Conduct and Notice of Privacy Practices and Privacy Policy and unlawfully disclosed Ms. Borrett's Private Information.

218. Plaintiff Borrett suffered damages in form of (i) invasion of privacy; (ii) loss of control over her Private Information; (iii) statutory damages under the ECPA; and (iv) Defendant's unjust retention of benefits obtained from its unauthorized use and disclosure of her Private Information.

219. Plaintiff Borrett has a continuing interest in ensuring that her Private Information, which remains in Defendant's possession, is protected and safeguarded from future unauthorized disclosure.

## TOLLING

220. Any statute of limitations applicable to Plaintiff's claims have been tolled by Defendant's actual knowledge and efforts to conceal the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff had no obvious way to discover Defendant's deception and unlawful conduct.

221. Plaintiff did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was acting unlawfully. The earliest Plaintiff or a reasonable User of Defendant's Websites could have learned of Defendant's conduct was approximately June 2026, when Plaintiff's counsel, through an independent technical investigation, identified Tracking Tools operating on Defendant's Websites and transmitting User

healthcare communications and identifiers to third parties. Defendant's alleged representations were material to Users at all relevant times. Before the expiration of any applicable limitations period, Users could not have discovered Defendant's wrongful conduct through the exercise of reasonable diligence, because Defendant's incorporation of the Tracking Tools is highly technical, undiscoverable by ordinary users of Defendant's Website, and Defendant made no disclosures or other indications that would inform a reasonable user of its Websites that Defendant was intercepting and disclosing Users' individually-identifiable health information to third parties.

222. At all relevant times, Defendant was—and still is—under a continuous duty to disclose to Users the true nature of the disclosures being made and the lack of an actual "requirement" before it shared Users' data with third parties, including but not limited to, Google.

223. Defendant knowingly, actively, affirmatively or negligently concealed the facts alleged herein.

224. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Tennessee's concealment rule, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CLASS ACTION ALLEGATIONS

225. Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated (the "Class") under Rules 23(b)(2), 23(b)(3) and 23(c)(4) of the Federal Rules of Civil Procedure.

226. The Class that Plaintiff seeks to represent is defined as follows:

> All people who used one or more of Defendant's Websites and who had their Private Information disclosed or transmitted to Google or any other unauthorized third party.

227. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries; any entity in which Defendant has a controlling interest; any of Defendant's officer(s) or

director(s); any successor or assign; Defendant's and Plaintiff's attorneys in this action, their staff and immediate family; and any Judge who adjudicates this case, including their staff and immediate family.

228. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

229. This action is properly maintained as a class action under Rule 23(a)(1), because the Class is so numerous and geographically dispersed that their joinder would be impracticable. Plaintiff believes that the business records of Defendant and Google will permit the identification of thousands of people meeting the Class definition.

230. This action is properly maintained as a class action under Rule 23(a)(2), because there are many common questions of facts and law concerning and affecting the Class, including:

a. Whether Defendant had a duty to protect and refrain from disclosing Users' individually identifiable health information;

b. Whether Defendant intentionally disclosed Users' individually identifiable health information to third parties, including but not limited to Google;

c. Whether Users consented to Defendant's disclosure of their individually identifiable health information to third parties, including but not limited to Google;

d. Whether Users are entitled to damages because of Defendant's conduct; and

e. Whether Defendant's knowing disclosure of Users' individually identifiable health information to third parties, including but not limited to Google, is "criminal or tortious" under 18 U.S.C. § 2511(2)(d).

231. Plaintiff also anticipates that Defendant will raise defenses common to the Class.

232. This action is properly maintained as a class action under Rule 23(a)(3), because Plaintiff's claims are typical of the claims belonging to the Class. Plaintiff and the Class were harmed by the same wrongful conduct perpetrated by Defendant that caused their Private

Information to be intercepted and disclosed without notice or consent. As a result, Plaintiff's claims are based on the same facts and legal theories as the Class's claims.

233. This action is properly maintained as a class action under Rule 23(a)(4), because Plaintiff will fairly and adequately protect the interests of the Class; there are no known conflicts of interest between Plaintiff and the Class; and Plaintiff has retained counsel experienced in the prosecution of complex litigation.

234. Class certification is appropriate under Rule 23(b)(3), because common questions of law and fact predominate over questions affecting the individual Class Members; because a class action is superior to other available methods for the fair and efficient adjudication of these claims; and because important public interests will be served by addressing the matter as a class action. Further, the prosecution of separate actions by the individual Class Members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant and substantially impair the Class Members' ability to protect their interests.

235. The State of Tennessee has a significant interest in regulating the conduct of businesses operating within its borders.

236. Tennessee, which seeks to protect the rights and interests of Tennessee and all residents and citizens of the United States against a company headquartered and doing business in Tennessee, has a greater interest in the claims of Plaintiff and the Class than any other state and is most intimately concerned with the claims and outcome of this litigation.

237. The principal place of business and headquarters of Defendant, located in Tennessee, is the "nerve center" of Defendant's business activities—the place where its high-level officers direct, control and coordinate its activities, including major policy, financial and legal decisions.

238. Defendant's actions and corporate decisions surrounding the allegations made in the Complaint were made from and in Tennessee.

239. Defendant's breaches of duty to Plaintiff and Class emanated from Tennessee.

240. Application of Tennessee law to the Class with respect to Plaintiff's and the Class's common law claims is neither arbitrary nor fundamentally unfair because, under choice-of-law principles applicable to this action, the common law of Tennessee applies to the nationwide common law claims of the Class. Additionally, given Tennessee's significant interest in regulating the conduct of businesses operating within its borders and that Tennessee has the most significant relationship to Ardent, which is headquartered in Tennessee, there is no conflict in applying Tennessee law to non-resident consumers such as Plaintiff and Class. Alternatively, and/or in addition to Tennessee law, the laws set forth below apply to the conduct described herein.

## COUNT I
## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA") 18 U.S.C. § 2510, *et seq.*

241. Plaintiff incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

242. The ECPA prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

243. The ECPA protects both the sending and receipt of communications.

244. The ECPA provides a private right of action to any person whose wire or electronic communications are intercepted. *Id.* § 2520(a).

245. Defendant intentionally intercepted electronic communications that Users exchanged with Defendant through the Tracking Tools installed on Defendant's Websites.

246. The transmissions of data between Users and Defendant qualify as communications under the ECPA. *Id.* § 2510(12).

247. Defendant contemporaneously intercepted and transmitted Users' communications to third parties, including but not limited to Google.

248. The intercepted communications include:

a. The content of Users' communications relating to appointments with medical providers;

b. The content of Users' communications relating to specific healthcare providers, conditions, treatments, diagnoses, prognoses, prescription drugs, symptoms, insurance, and payment information;

c. Button/menu selections and/or content typed into free text boxes; and

d. Full-string URLs that contain any information concerning the substance, purport, or meaning of Users' communications with their health entities.

249. The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. The cookies Defendant and third parties, including but not limited to, Google and AdTheorent, use to track Users' communications;

b. Users' browsers;

c. Users' computing devices, including desktop computers, laptop computers, tablets and smartphones;

d. Defendant's web-servers or webpages where the Tracking Tools are present;

e. Google's web-servers; and

f. The third-party analytics scripts embedded in Defendant's Websites, which intercept and transmit Users' communications to third parties.

250. Google and other third parties are not parties to Users' communications with Defendant.

251. Defendant transmits the content of Users' communications to third parties, including but not limited to Google, through the surreptitious redirection of those communications from Users' computing devices.

252. Users did not consent to third parties' acquisition of their appointment and treatment communications with Lovelace Health System and other Ardent-affiliated healthcare providers through Defendant's Websites.

253. Third parties like Google did not obtain legal authorization to obtain Users' communications with Defendant relating to communications with their health entities.

254. In disclosing the content of Users' communications relating to treatments, conditions and appointments, Defendant had a purpose that was tortious, criminal and designed to violate state constitutional and statutory provisions, as follows:

a. The unauthorized disclosure of individually identifiable health information is tortuous in and of itself, regardless of whether the means deployed to disclose the information violates the ECPA or any subsequent purpose or use for the acquisition. Defendant intentionally committed a tortious act by disclosing individually identifiable health information without authorization to do so.

b. The unauthorized acquisition of individually identifiable health information is a criminal violation of 42 U.S.C. § 1320d-6, regardless of any subsequent purpose or use of the individually identifiable health information. Defendant intentionally violated 42 U.S.C. 1320d-6 by intentionally disclosing individually identifiable health information without authorization.

c. A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, is a crime punishable by fine or imprisonment with *increased penalties* where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain." Defendant intentionally violated the enhanced penalty provision of 42 U.S.C. § 1320d-6 by disclosing the individually identifiable health information "with intent to sell transfer or use" it for "commercial advantage [or] personal gain."

d. Breach of confidence; and

e. Trespass upon Users' personal and private property via the placement of the Tracking Tools on Users' personal computing devices is tortious.

255. Defendant's intent to disclose Users' Private Information to Google and other third parties existed before each interception because Defendant affirmatively chose to deploy, configure, and maintain the Tracking Tools on its Websites that were designed to capture and transmit Users' communications for Defendant's marketing, commercial advantage, and profit.

256. To the extent Defendant contends it was a party to the communications at issue, the party exception in 18 U.S.C. § 2511(2)(d) does not bar liability, because Defendant intercepted Users' communications for the purpose of committing criminal and tortious acts, including knowingly disclosing individually identifiable health information to third parties in violation of 42 U.S.C. § 1320d-6(a)(3), and doing so for commercial advantage and personal gain.

257. Users' Private Information that Defendant disclosed to third parties qualifies as individually identifiable health information, and Defendant violated Plaintiff's expectations of privacy, which constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d(6). Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools and other codes to track and utilize Users' Private Information for its own financial benefit.

258. Users did not authorize Defendant to acquire the contents of their communications through the Tracking Tools or to use those communications to invade their privacy. Users reasonably expected that Defendant would not redirect the contents of their communications, together with personal identifiers, to third parties without their knowledge or consent.

259. Any purported consent that Defendant received from Users was not valid.

260. Defendant's scheme or artifice to defraud in this action further consists of the false and misleading statements and omissions in its Code and Privacy Policies set forth above.

261. Defendant acted with the intent to defraud by willfully invading Users' property rights, including their:

a. Property right to the confidentiality of their Private Information, their right to determine whether such information remains confidential and their exclusive right to determine who may collect and/or use such information for marketing purposes; and

b. Property right to determine who has access to their computing devices.

262. Defendant acted with the intent to defraud by willfully invading and taking Users' property:

a. With knowledge that (1) Defendant did not have the right to share Users' Private Information without written authorization; (2) courts have determined that a covered entity's use of similar Tracking Tools gave rise to claims for invasion of privacy and violations of state criminal statutes; (3) a reasonable User would not understand that Google and other third party vendors were collecting their Private Information based on their activities on Defendant's Websites; and (4) the subsequent use of health information for advertising was a further invasion of Users' property rights to make exclusive use of their individually-identifiable health information for any purpose not related to the provision of their healthcare.

b. With the intent to (1) acquire Users' individually identifiable health information without their authorization and without their healthcare providers or covered entities obtaining the right to share such information; and (2) use the Users' individually-identifiable health information without their authorization.

263. Users have suffered damages because of Defendant's violations of the ECPA that include:

a. Defendant eroded the essential, confidential nature of the provider-patient relationships of Users;

b. Defendant failed to provide Users with the full value of the medical services for which they paid, which included a duty to maintain the confidentiality of their patient information;

c. Defendant derived valuable benefits from using and sharing the contents of Users' communications on its Websites without their knowledge or informed consent, and without providing any compensation for the information it used or shared;

d. Defendant's actions deprived Users of the value of their individually identifiable health information;

e. Defendant's actions diminished the value of Users' property rights in their individually identifiable health information; and

f. violating Users' privacy rights by sharing their individually identifiable health information for commercial use.

264. For Defendant's violations set forth above, Users seek appropriate equitable or declaratory relief, including injunctive relief; actual damages and "any profits made by [Defendant] as a result" of its violations or the appropriate statutory measure of damages; punitive damages in an amount to be determined by a jury; and a reasonable attorney's fee and other litigation costs reasonably incurred under 18 U.S.C § 2520.

265. Unless enjoined, Defendant may continue to commit the violations of law alleged here.

266. Plaintiff wants to continue to communicate with her healthcare providers through online platforms but has no practical way of knowing if her communications are being intercepted and disclosed to Google and other third parties and thus continues to be at risk of harm from Defendant's conduct.

267. Under 18 U.S.C. § 2520, Users seek monetary damages for the *greater of* (i) the sum of the actual damages suffered by Users and any profits made by Defendant as a result of the violations or (ii) statutory damages of whichever is greater of $100 a day for each violation or $10,000.

## COUNT II
## UNJUST ENRICHMENT

268. Plaintiff re-alleges and incorporates by reference all prior paragraphs as if fully set forth herein.

271. Defendant benefitted from Users' Private Information and unjustly retained those benefits at their expense.

272. Users conferred a benefit upon Defendant in the form of Private Information that Defendant collected from them, without authorization and proper compensation. Defendant consciously collected and used this information for its own gain, providing Defendant with economic, intangible and other benefits, including substantial monetary compensation.

273. That is, in exchange for disclosing the Private Information of its Users, Defendant is compensated by Google and other third parties, in the form of enhanced advertising services and more cost-efficient marketing on third-party platforms. By utilizing the Tracking Tools, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

274. Users provided their Private Information to Defendant in reliance on Defendant's privacy representations that it would not disclose their Private Information to third parties for marketing or other unauthorized purposes. Users did not intend to confer the advertising, analytics, retargeting, or other commercial benefits that Defendant obtained through the unauthorized disclosure of their Private Information.

275. Defendant unjustly retained those benefits at the expense of Users, because Defendant's conduct damaged Users, all without providing any commensurate compensation to Users.

276. The benefits that Defendant derived from Users were not offered by Users gratuitously and rightly belong to Users. It would be inequitable under unjust enrichment

principles in Tennessee for Defendant to be permitted to retain any of the revenue or other benefits wrongly derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

277. Defendant should be compelled to disgorge, into a common fund for the benefit of Users, all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

**WHEREFORE**, Ms. Borrett, on behalf of herself and all those similarly situated, respectfully prays for judgment in her favor and against Defendant as follows:

- For an Order certifying this action as a class action and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;
- For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Users' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Users;
- For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage and safety, and to disclose with specificity the type of PII and PHI disclosed to third parties;
- For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;
- For an award of actual damages, compensatory damages, statutory damages, nominal damages and statutory penalties, in an amount to be determined as allowable by law;
- For an award of punitive damages as allowable by law;
- For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;
- Pre- and post-judgment interest on any amounts awarded; and
- All such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands that this matter be tried before a jury.

Date: July 30, 2026

Respectfully submitted,


/s/ *Charles P. Yezbak, III*
Charles P. Yezbak, III (TN BPR # 018965)
/s/ *Melody Fowler-Green*
Melody Fowler-Green (TN BPR # 023266)
/s/ *N. Chase Teeples*
N. Chase Teeples (TN BPR # 032400)
YEZBAK LAW
2901 Dobbs Ave.
Nashville, TN 37211
(615) 250-2000
yezbak@yezbaklaw.com
mel@yezbaklaw.com
teeples@yezbaklaw.com

/s/ *James B. Zouras*
James B. Zouras* (IL BPR # 6230596)
/s/ *Ryan F. Stephan*
Ryan F. Stephan* (IL BPR # 6273101)
/s/ *Michael J. Casas*
Michael J. Casas* (IL BPR # 6343255)
/s/ *Gillian Kimmons*
Gillian Kimmons* (IL BPR # 6349546)
**STEPHAN ZOURAS, LLC**
222 W. Adams St, Suite 2020
Chicago, Illinois 60606
312.233.1550
312.233.1560 *f*
jzouras@stephanzouras.com
rstephan@stephanzouras.com
mcasas@stephanzouras.com
gkimmons@stephanzouras.com

*Attorneys for Plaintiff and the Putative Class*


*Mr. Stephan, Mr. Zouras, Mr. Casas, and Ms. Kimmons, members of the Illinois bar, intend to seek *pro hac vice* admission in this case.